BELLA OLITSKY

*v.*

CELIA ESTERSOHN et al.

[Submitted July 8th, 1919. Decided August 21st, 1919.]

1. Where O. bought real estate at a bankruptcy sale in his own name, which sale was afterwards confirmed by the bankruptcy court, and the trustee ordered to execute a deed to the purchaser, and afterwards the trustee executed a deed to O. and his wife, on the death of O. the wife takes the property as surviving tenant by the entirety.

2. Under the evidence in this case—*Held*, that the inserting of the name of the wife in the deed was not procured by her through "fraud, coercion and importunities" practiced upon her husband.

On bill, &c.

*Mr. Martin P. Devlin,* for the complainant.

*Mr. Aaron V. Dawes* and *Mr. Harry Heher,* for the defendants.

BACKES, V. C:

This bill is to assign dower and for arrears. Harry Olitsky died leaving the complainant, his widow, and five children by a former marriage, the defendants. He died intestate seized of twenty-eight improved properties in which it is admitted the complainant is entitled to dower and to a third of the income since his death. By way of counter-claim the defendants seek an accounting of the rents of a property at Broad and Beatty streets, Trenton, conveyed by the trustee in bankruptcy of one Wineberg to Harry Olitsky and Bella Olitsky, his wife, the legal title of which is now in the complainant by survivorship. The counter-claim assails the validity of this conveyance, in so far as it includes the name of the complainant, on the ground that she

procured it to be made "through fraud, coercion and importunities" practiced upon her husband, and on the further ground that the deed was void as to her because it was not made in conformity with the order of confirmation of the bankruptcy court. At the bankruptcy sale the property was struck off to Harry Olitsky, and was so reported to the court and confirmed, and the trustee was ordered to execute and deliver a deed to him. Instead of following this direction, the trustee conveyed to him and his wife. Besides a prayer for an accounting for the rents, and one for general relief, the counter-claim prays "that it may be decreed that the said Bella Olitsky by fraud, coercion and importunities in violation of her duties, procured her said husband to have inserted her name in the said deed," and "that this court may, according to the statute in such cases made and provided [whatever that means] decree and determine that the said Bella Olitsky did not take any estate, interest or title under the deed made by Harry Klagg, Jr., trustee of Morris Wineberg to Harry Olitsky, and that the said deed may be so accordingly construed." There is no prayer for an ultimate disposition of the deed, and the ambiguous prayers, which I have quoted, appear to be merely by way of inducement to the prayer for an accounting of the rent as an offset to the rents collected by the defendants. At the hearing I intimated doubts as to the propriety of the counter-claim, but as the parties regarded it as a direct attack upon the deed, calling for a decree setting it aside as to the complainant, the case was tried and submitted upon that theory, both sides agreeing to waive all irregularity, and that it should be treated as an original bill if necessary.

1. "The fraud, coercion and importunities" particularized in the counter-claim are that Olitsky was fifty-five to sixty years old, and his wife thirty; that he "was sick, and had been so for some time, to such a degree that he was dependent upon his said wife, Bella Olitsky, for wifely administration and services in his greatly weakened condition;" that the complainant was his second wife "and was greatly jealous of the children by his first wife;" that from the time of her marriage she "was con-

tinually importuning him to make over his property to her and to disinherit his said children, and she was so greedy and so importunate in her demands that the said Harry Olitsky, on account of her greed and attempts to get hold of his property, became greatly distressed and was worried to such an extent that he several times stated that he could hardly restrain himself from taking his own life;" that "the said Bella Olitsky, at the time her said husband was depressed, and in addition to the unwifely conduct above detailed, knew that her husband was wrought up to a high state of nervous tension from the pressure of his debts and liabilities, and in order to hamper him in meeting his obligations, and with a view of getting possession of this piece of property, refused to assist him in any way in raising money on his property unless he gave in to her extortionate demand in putting this property in their joint names; which property was the most valuable piece which the said Harry Olitsky owned, worth more than all his other property put together;" and that "it was by and through the fraud, coercion and importunities of the said Bella Olitsky, under the circumstances above detailed, that she procured the deed to be made for the above tract of land in the joint names of herself and husband." Vague and indefinite as these allegations are, to make out a case of duress, the proofs are even less satisfactory.

Olitsky was forty-two, not fifty-five to sixty years of age, and his wife, a widow, was thirty-eight, when they were married July 4th, 1916. He was not sick. He had stomach trouble, but otherwise was healthy, physically and mentally. He died of pneumonia. He was never in a weakened condition, greatly or otherwise, nor was he ever dependent upon his wife, nor was she jealous of his children. He held the purse. He personally bought and paid for the household provisions and his children's and wife's apparel, and the latter stintedly. Ready cash he dealt out to her penuriously. She was simply wife and housekeeper and the caretaker of his children. She was the dependent; he dominated. He had been in the butcher business from which he retired some time before contracting the second marriage. After that and until his death, June 15th, 1918, he

dabbled in real estate and mortgages, and sold his credit for a bonus. He was a keen, shrewd business man and a money-getter until he met the not uncommon fate of those who endorse commercial paper for profit or out of friendship. Shortly after the marriage two notes of $5,000 each, upon which he was endorser for pay, were protested, and the makers, one of whom was Wineberg, were adjudged bankrupts. The prospect of a total loss made him "sick," indeed, but with an ailment that does not yield to medication. He was grief-stricken and heart-sore, no doubt, and suicidal with reservations. The deed was executed during this period of agitation and despair. There is nothing in this situation of the parties to raise the presumption of undue influence within the doctrine of *Haydock* v. *Haydock, 34 N. J. Eq. 570*, and the string of authorities in this state that follows the rule of that case that "where a person enfeebled in mind by disease or old age, is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee." Nor can I perceive the slightest resemblance, in fact or principle, to the case of *Thorp* v. *Smith, 63 N. J. Eq. 70; affirmed, 65 N. J. Eq. 400*, which the defendants' counsel say most closely fits their case.

The inquiry, then, is, Was there actual duress or undue influence exerted? Olitsky had courted his wife a very short time. He had made it plain that he wanted her to mother his children, and she understood. That the marriage was one of reciprocal material welfare is evident, and as an inducement he had promised her some of his realty. The amount of the dot was not fixed. I have no doubt she often reminded him of his promise, and urged its performance, but that he fulfilled it through "fraud, coercion and importunities," is far from established. The Broad and Beatty street property was struck off to Olitsky December 12th, 1916, free and clear of encumbrance, for $14,500. This was barely sufficient to discharge the liens prior to the mortgage of $4,300 held by him to secure the bank-

rupt's note of $5,000, which he had endorsed. He paid down ten per cent. of his bid and then defaulted. The deed was delivered March 13th, 1917, under pressure of a rule to show cause why the property should not be resold because of the default. Olitsky raised the purchase price by mortgaging the premises for $9,000, by a mortgage of $4,000 on other property, and by a note of $1,300 endorsed by his counsel and discounted at a local bank, secured by mortgage. Effort was made to show that the delayed action was due to the refusal of the complainant to join her husband in the execution of these mortgages unless and until he agreed to have her name inserted in the trustee's deed as one of the grantees, and that in his financial distress, of which the complainant took advantage, he was forced to comply with her demand, and that he was the helpless victim of her oppression. I pause to say that if the complainant had taken advantage of her position, I would have had great difficulty in finding duress, considering the antenuptial promise, and that the refusal to pledge her dower right was perfectly lawful. But I need not pass upon this because the proofs show that the delay of more than three months in carrying out the conditions of sale was due entirely to Olitsky's vacillation. That is made clear by the testimony of Lavine, his nephew and adviser, who says that Olitsky wanted to drop the sale because he did not think it would pay him to bother with it, and that it was only through the witness's constant and persistent urging and advice not to do so that it was eventually consummated. And to this witness he said that he was going to put the property in his name and that of his wife's, and afterwards told him that he had done so.

Wineberg, the bankrupt, who was deeply interested in having the deed set aside, and two of the children, defendants, who showed bitterness towards their stepmother, say that the complainant threatened to leave her husband unless he made her a co-grantee. Denying, the complainant admits having made such a threat, but explains the occasion to have been her mortification when her husband stole a fish from a grocery and was arrested for it. I take little stock in these so-called threats.

If made, it does not appear that they were uttered menacingly or that they were looked upon with alarm. The only other witness, Mr. Heher, Olitsky's legal adviser, who now represents the defendants, was pressed into service, but I am confident that his professional relation to the case would not consciously influence him to swerve an iota from the truth. He describes his client's financial dilemma and his great mental distress and excitement and restlessness and threats at suicide with lawyer-like solicitude. I can imagine him depressed and distracted, but also discern an exaggeration of his woes when seeking financial succor and sympathy and advice from his friend and counsel, often fallen for by the experienced practitioner with later embarrassment and regret. With all, it is perfectly apparent that Olitsky had his wits about him, and, amid his tribulation and lamentation, was scheming and striving intelligently and desperately to disentangle himself. Before the situation became acute the complainant called upon Mr. Heher two or three times to have him persuade her husband to protect her by a will. These visits came to naught, either because of Olitsky's refusal or Heher's failure to intercede. In the meanwhile, Olitsky negotiated the mortgages of $9,000 and $4,000 with the Mortgage and Securities Company, and by appointment he and his wife went to Mr. Heher's office to arrange for their execution. Mr. Heher says the complainant refused to sign unless protected either by the conveyance of some property or by will; and that her husband declined, protesting that he had to take care of his children, and that they were deadlocked when they left, but that the complainant later yielded and the mortgages were executed. There is not a word of evidence in the case to the effect that the complainant executed the mortgages upon condition that she be joined as a co-grantee of the Broad and Beatty street property, or that her husband was forced to include her to induce her to sign. Mr. Heher is careful not to say that she made any such demand; what she asked, he said, was that she be protected by the conveyance of some property or by will. What mollified her does not appear, but I surmise it was a reassurance of the fulfillment of the antenuptial promise. The complainant

says she executed the mortgages willingly and as voluntarily as she had many others, and that it was not until after the mortgages were executed—a few days afterwards—that it was first suggested to incorporate her name in the trustee's deed. Her story is that when Wineberg, the bankrupt, came to her home to lease the premises (a lease was afterwards made to Wineberg's wife with an option to buy, in which the complainant refused to join because the price was not to her satisfaction) she said to her husband she wanted the property put in their names jointly, which he at first refused to do, and being again reminded of his promises, consented and told her to call up Mr. Heher and tell him to have the deed made out in both their names; that she telephoned the message and was told to come to his office with her husband. This, she says, was Saturday, and they went the following Monday, when her husband verified the message that he wanted the title put in both names, and that Mr. Heher explained to him that if he died the property would belong to the complainant, to which he replied, "She is not my servant; she is my wife." Mr. Heher does not say this did not occur. He seems to have no recollection whatever of the circumstances attending the drafting and execution of the deed, nor that it contained the name of the complainant when he sent it to be recorded. I feel satisfied that his client gave him the directions as the complainant states, for Mr. Dickinson, the trustee's lawyer, who drew the deed, says he got his instructions as to the grantees from Mr. Heher, and from no one else. And I have no doubt Mr. Heher knew of the arrangement, although it has passed from his memory, for in the mortgage he took, on the day the deed was delivered, to secure the $1,300 note he endorsed, it is recited that the property was conveyed to Olitsky and the complainant. Another telling thing is: The mortgages bear date and were signed and acknowledged March 8th, and the trustee's deed was not drawn until March 13th, five days later. This is clear from a letter before me written by Mr. Heher to Mr. Dickinson instructing him as to its form and phraseology. This letter bears date March 13th and proves conclusively that the deed was not in existence at the time the mort-

gages were signed by the complainant and establishes beyond peradventure that her name was not inserted under pressure of refusal to sign the mortgages. Another feature evincing that the deed was the voluntary act of Olitsky is, that during the remainder of his life—fifteen months—he did not dispute it nor in the least complain that he had been imposed upon. This reflects his attitude, and his long acquiescence is a confirmation and ratification. *Pom. Eq. Jur.* § *964.*

2. The other attack on the deed is upon the purely legal ground that it is void because it does not conform to the order of confirmation. In *Den* v. *Lambert, 13 N. J. Law 182,* commissioners appointed by the orphans court to make sale of lands of a decedent, struck off the property to a bidder, the sale was confirmed and they were ordered to make a conveyance to him. They conveyed to the bidder and another. In the action in ejectment the trial court rejected the deed and nonsuited the plaintiff. Upon a rule to show cause the supreme court sustained the nonsuit and declared the deed void, because it was not in compliance with the order confirming the sale, the court holding that a naked power must be strictly pursued. There the authority of the commissioners was the order directing the specific conveyance. The principle governing that decision is not applicable where the power of sale is by law in the official, to be exercised with the approval of the court, as the report of the case shows. Under section 72 (*a*) of the Bankruptcy act title to lands of a bankrupt vests in the trustee, upon his appointment and qualification, as of the date of the adjudication in bankruptcy. The power to sell is inherent; when practicable, sales are subject to the approval of the court. The authority to convey does not originate in the court's orders. The court's function is supervisory, to approve or not in sound discretion. The direction to execute and deliver a deed is mere formality.

The defendants cite the cases of *In re Burr, Manufacturing and Supply Co., 217 Fed. Rep. 16; Stang* v. *Redden, 28 Fed. Rep. 11; Robertson* v. *Howard, 229 U. S. 254; In re Shea, 126 Fed. Rep. 153,* and *Davis* v. *Ives, 75 Conn. 611,* all of which are

to the effect that a sale by a trustee in bankruptcy must be confirmed by the court, and that upon such confirmation the equitable title vests in the purchaser. In *Cropper* v. *Brown,* 76 *N. J. Eq. 406,* this court held that the equitable title passed at the time of the sale and before confirmation. And from this their counsel argue that as the equitable title was in Harry Olitsky, the conveyance by the trustee of the legal title to him and his wife was ineffectual as to the complainant, because he had not conveyed to her the equitable title *pro tanto* by writing, as provided by section 4 of the Frauds and Perjuries act (*Comp. Stat. p. 2612*), which provides "that all grants and assignments of any trust or confidence shall be in writing signed by the party granting or assigning the same." The argument is far-fetched. The question whether the equitable estate was conveyed by writing in compliance with the statute is wholly irrelevant. The litigation does not involve the equitable estate, and the issue is not whether such an estate should be enforced in defiance of the statute. The legal estate superseded and merged the equitable estate when Olitsky caused the trustee to convey the legal and equitable title to him and his wife. Olitsky could not raise the objection, nor can the defendants. The law applicable to such a situation is discussed in a *dictum* in *Den.* v. *Lambert, supra.* There the property, it will be remembered, was struck down to Hoppock, and the conveyance was made to Hoppock and Larason, which was held not to pass title as against another claimant of the land, but as between Hoppock and Larason, Mr. Justice Drake had this to say, and I quote at length: "There can be no doubt that a person may bid at an auction, as well as buy at private sale, either for himself alone, or for himself jointly with another, or wholly as agent for a third person; and the sale will be valid, whether he bids in his own name, and is set down as purchaser, or in the name of his principal. *2 Taunt. 38; 4 Taunt. 209; 5 Esp. Rep. 70; 1 Bos. & Pul. 323.* And if he buy at private sale, or bid for himself at auction, he may afterwards transfer his contract and interest in the property, so that the transferee shall have an equitable title, which a court of equity will enforce, if unexecuted, very generally, as against

the vendee who thus transfers his interest, and, under circumstances, as against the vendor. *Sugd. Vend. 130, 1, 2, 3; 2 Ves. & Beame 389; 6 Ves. Jr. 352; 7 Ves. Jr. 265; 1 Meriv. 47.* And there are good reasons for the application of the same principles to sales made by public officers, under the direction of a statute, or the order of a court. A policy less liberal might have an injurious operation upon the price of property exposed to such sales.

"Upon these principles, if Hoppock bid for himself and Larason, or for himself alone, and afterwards transferred to Larason his interest in one-half the property, a court of equity would oblige him to convey the legal title in conformity with such equitable interest.

"But what is the evidence of such relationship between Hoppock and Larason? I answer, the acknowledgment of Hoppock. He has accepted a deed from the commissioners uniting Larason with himself in the purchase, and taking the land with him *as tenants in common.* Hoppock, after this, without further proof, cannot deny the fact that Larason is in equity equally entitled with himself. Why, then, should not this deed, purporting to convey the property to them, *as tenants in common,* in strict accordance with their equitable interest, be deemed valid? In a contest between them it should be considered as a conveyance to both, if to either. As between them, it purports to do, precisely what, according to equity, should be done. And to set it aside, in order that a new conveyance may be made from Hoppock to effect the same result, would be idle. I am, therefore, of opinion that if this deed conveyed any title to Hoppock, it did also to Larason, and that there is no good ground to distinguish between them."

The counter-claim will be dismissed, with costs.